

U.S. Department of Justice

*United States Attorney
Eastern District of New York*

JPL/TJT:MGD  
F. #2021R00827

*271 Cadman Plaza East
Brooklyn, New York 11201*

July 8, 2024

By ECF

The Honorable Hector Gonzalez  
United States District Judge  
Eastern District of New York  
225 Cadman Plaza East  
Brooklyn, New York 11201

      Re:   United States v. Jian Ai Chen  
            <u>Criminal Docket No. 23-255 (HG)</u>

Dear Judge Gonzalez:

      The government respectfully submits this letter in anticipation of sentencing in the above-referenced case, currently scheduled for July 15, 2024 at 11:00 a.m., and in response to the sentencing memorandum filed by the defendant Jian Ai "Maggie" Chen (the "defendant" or "Chen"), dated June 29, 2024 ("Def. Mem.").

      According to the pre-sentence investigation report filed on May 9, 2024 (the "PSR") and the addendum to the PSR filed on May 24, 2024 (the "Addendum"), the defendant's total offense level under the United States Sentencing Guidelines (the "Guidelines") is level 24 and her Criminal History Category is I, which yields an applicable Guidelines range of imprisonment of 51 to 63 months. (<u>See</u> PSR at ¶¶ 70, 104).

      The government respectfully requests that the Court impose a sentence within the Guidelines range. A sentence of imprisonment between 51 and 63 months would accomplish the goals of Title 18, United States Code, Section 3553(a) ("Section 3553(a)").

    I.     <u>The Offense Conduct</u>

      Between January 2010 and January 2021, Chen, together with co-conspirators including Amanda Hon, Si Ci Zhu, Florence Mui, Chi Kwan "Ken" Wong and Dr. John Yiu[1] carried out a fraudulent scheme at AC Pharmacy ("AC") and A Star Pharmacy ("A Star" and, together, the "Scheme Pharmacies") whereby claims were submitted to Medicare and Medicaid

---

[1] Hon (22-CR-60), Zhu (22-CR-14), Mui (21-CR-314), Wong (23-CR-88) and Yiu (23-CR-89) have each pleaded guilty to their roles in the conspiracy. (<u>See</u> PSR at 3.)

for prescription drugs that were procured by the payments of bribes and kickbacks, not medically necessary, and not actually dispensed to beneficiaries. (PSR ¶ 27.)

In particular, Hon, Chen and Zhu, as well as other co-conspirators, agreed to pay, and caused to be paid, illegal bribes and kickbacks to individuals associated with a medical clinic referred to in the indictment as Clinic-1, in exchange for the referral of Clinic-1 patients to the Scheme Pharmacies. (PSR ¶ 28.) Chen was employed as a medical assistant at Clinic-1 and was instrumental in arranging the kickback relationships, including with Yiu, a physician at Clinic-1. Yiu wrote prescriptions absent medical necessity, including but not limited to expensive medications such as diclofenac epolamine (which he had generally not prescribed prior to beginning to accept kickbacks from Chen and her co-conspirators), to patients who then brought their prescriptions to AC. (PSR ¶ 32.)

Additionally, Hon and Chen, as well as other co-conspirators, paid bribes and kickbacks to patients so that they would bring their prescriptions to be filled at the Scheme Pharmacies, including but not limited to diclofenac epolamine prescribed by physicians at Clinic-1, and so that the Scheme Pharmacies could take for themselves the value of patients' Medicare over-the-counter ("OTC") benefits.[2] The bribes typically took the form of cash-equivalent supermarket coupons. (PSR ¶ 38.) Between January 2012 and January 2021, the Scheme Pharmacies paid approximately $5 million for gift certificates to supermarkets near the Scheme Pharmacies. (PSR ¶ 40.)

In approximately 2017, the scheme established at AC expanded to the newly-established A Star, where Chen also received bribes in exchange for patient referrals. At A Star, Wong provided information regarding highly profitable prescription drugs to Chen, as well as Hon and others, so that Chen could obtain prescriptions for those medications from Clinic-1. A Star then billed beneficiaries' and recipients' insurance plans for dispensing those medications without regard to medical necessity. (PSR ¶ 34.)

Between January 2010 and January 2021, AC received approximately $75 million in reimbursement for claims from Medicare and Medicaid. Between September 2016 and January 2021, A Star received approximately $26 million in reimbursement for claims from the Medicare and Medicaid. Of those claims, at least $11 million worth were for pharmaceuticals that were not dispensed at all. (PSR ¶ 36.)

For her participation in the conspiracy, including but not limited to facilitating the recruitment of medical professionals for illegal bribe- and kickback-tainted referral relationships and further facilitating the prescription of medically unnecessary pharmaceuticals, Chen was paid over $1.5 million in fraudulent proceeds. (Plea Agreement ¶ 6.) Those proceeds were

---

[2] Certain Medicare plans provided their beneficiaries with debit cards (the "OTC Cards") containing funds that were to be used for the purpose of purchasing certain designated OTC items, such as painkillers and first aid materials. The balances on the OTC Cards were renewed on a monthly basis. (PSR ¶ 12.)

sometimes concealed as salary payments to a third party under Chen's control ("Individual-1" in the indictment), who did no work for the Scheme Pharmacies.  (PSR ¶ 29.)

## II.    Procedural Background

On October 13, 2021, the defendant pleaded guilty to an information charging her with conspiracy to commit health care fraud, in violation of 18 U.S.C. § 1349 (Count One), and conspiracy to pay health care kickbacks, in violation of 18 U.S.C. § 371 (Count Two).  (See PSR ¶ 47.)  On March 21, 2023, the defendant withdrew her guilty plea and, on June 13, 2023, was indicted on the same charges.  ECF No. 1.  The defendant pleaded guilty to the charged crimes on February 26, 2024.  (PSR ¶ 1.)

## III.    The Sentencing Guidelines

The Guidelines calculation set forth in paragraphs 60 through 70 of the PSR, as modified by the Addendum, and as set forth in the parties' plea agreement, is as follows:

| | |
|---|---|
| Base Offense Level (§ 2B1.1) | 6 |
| Plus: Loss more than $9,500,000 (§ 2B1.1(b)(1)(K)) | +20 |
| Plus: Federal health care offense with loss over $7,000,000 (§ 2B1.1(b)(1)(H)) | +3 |
| Minus: Zero-Point Offender | -2 |
| Total: | 27 |

The base offense level is reduced by three levels pursuant to Guidelines Section 3E1.1 in light of the defendant's acceptance of responsibility and timely plea of guilty, for a total offense level of 24.  (PSR ¶¶ 68-69.)  Accordingly, based upon a total offense level of 24 and a criminal history category of I, the applicable Guidelines range as calculated in the PSR, as amended by the Addendum, and as stipulated in the Plea Agreement, is 51 to 63 months' imprisonment.  (PSR ¶ 70; Plea Agreement ¶ 2.)

## IV.    A Custodial Sentence Within the Guidelines Range is Appropriate in this Case

The government respectfully requests that the Court impose a sentence that is sufficient but not greater than necessary to achieve the goals of sentencing.  See 18 U.S.C. § 3553(a).  The nature and circumstances of this case, the history and characteristics of the defendant, the need to promote respect for the law and provide just punishment, the need for specific and general deterrence and the need to avoid sentencing disparities (together, the "3553(a) factors") justify a custodial sentence between 51 and 63 months.

1. The Nature and Circumstances of the Offense and Characteristics of the Defendant

A custodial sentence between 51 and 63 months is appropriate considering the nature and circumstances of this offense and the defendant's characteristics.  The defendant was

3

an integral part of a conspiracy to defraud Medicare and Medicaid. As an owner-in-fact of the Scheme Pharmacies[3] and the individual responsible for bribing at least one medical professional (Yiu) to prescribe medically unnecessary medications, the defendant's role in the conspiracy was critical. The defendant's conduct was serious, placing patients at risk of harm and causing over $11 million in losses to the Medicare and Medicaid programs.

The defendant's decision to engage in these crimes was deliberate and calculated, and not a momentary lapse of judgment. It was not a one-time event; rather, she and her co-conspirators deliberately set up the Scheme Pharmacies so that they would run in a way that violated the law and put patients at risk by dispensing medications they did not need or want and by failing to dispense medications that were prescribed. Her conduct merits a significant sentence of imprisonment.

In her sentencing memorandum the defendant asserts that "[p]rior to her conviction, [she] was a law-abiding American," and that "[t]his case has been her only contact with the criminal justice system." Def. Mem. at 3. This argument ignores the fact that the defendant was part of the conspiracy for more than <u>eleven years</u>. (PSR ¶¶ 2-3.) Nor was her participation passive – her role in the conspiracy required constant illegal referrals and patient steering, interaction with Wong and others regarding lucrative prescription drugs, and regular active concealment of her financial stake in the matter. Her conduct led to a loss of over $11 million to Medicare and Medicaid and potential patient harm, and she made over $1.5 million in the process. This is not the conduct of an "law-abiding American," but of a person who is knowingly, intentionally, and consistently committing health care fraud.

The defendant further argues that her family circumstances require her presence in the home. The defendant's family circumstances, while evidently difficult, do not mitigate her culpability in the criminal conduct here or counsel in favor of a non-Guidelines sentence. Indeed, almost all defendants who come before the Court for sentencing have family members who will be negatively affected by the imposition of a sentence of incarceration. As the Second Circuit has repeatedly emphasized, the Guidelines recognize that "disruption of [a] defendant's life, and the concomitant difficulties for those who depend on the defendant, are inherent in the punishment of incarceration." <u>United States v. Johnson</u>, 964 F.2d 124, 128 (2d Cir 1992); <u>United States v. Sprei</u>, 145 F.3d 528, 534 (2d Cir. 1998) ("family ties and responsibilities are a discouraged basis for departure"); <u>United States v. Smith</u>, 331 F.3d 292, 294 (2d Cir. 2003) ("Because the Guidelines disfavor departure based on family responsibilities such a departure is not permitted except in extraordinary circumstances."). Nonetheless, the government would not

---

[3] The defendant asserts, based on a misunderstanding of her plea hearing, that the government "abandoned" the argument that she had a proprietary interest in the conspiracy. Def. Mem. at 3 (citing 2/26/2024 Plea Transcript ("Tr.") at 11). That is incorrect: The defendant had a proprietary interest in the conspiracy and was paid over $1.5 million for her interest and participation. What the defendant refers to as "abandon[ment]" was the government's agreement that ownership of the Scheme Pharmacies was not an element of the charged offenses, an accurate statement of the law. (Tr. at 13:24-14:7.)

object to a slightly extended time period for surrender so that the defendant can make appropriate arrangements for her family's needs.

2. The Seriousness of the Offense, Deterrence and Protecting the Public

The Court's sentence should also reflect the seriousness of the offense, promote respect for the law and further the aims of specific and general deterrence. 18 U.S.C. § 3553(a)(2)(B), (C).

The fraud in which the defendant participated targeted national programs relied on by millions of Americans, which has very real implications for individual lives. Congress aptly summarized the effects of health care fraud over thirty-five years ago:

> In whatever form it is found, . . . fraud in these health care financing programs adversely affects all Americans. It cheats taxpayers who must ultimately bear the financial burden of misuse of funds in any government-sponsored program. It diverts from those most in need, the nation's elderly and poor, scarce program dollars that were intended to provide vitally needed quality health services.

H.R. Rep. 95-393, pt. II, at 44 (1977); see also H.R. Rep. 104-747 (1996) ("Everyone pays the price for health care fraud: beneficiaries of Government health care insurance such as Medicare and Medicaid pay more for medical services and equipment; consumers of private health insurance pay higher premiums; and taxpayers pay more to cover health care expenditures."). These concerns are just as pressing today as they were then, which is why Congress has enacted increasingly severe penalties for health care fraud, most recently directing the Sentencing Commission to add enhancements for defendants who commit the most financially serious health care frauds. See Patient Protection and Affordable Care Act, Pub. L. No. 111-148, §10606(a)(2)(C), 124 Stat. 119, 1007 (2010) (directing Sentencing Commission to amend guidelines in order to punish health care fraud more severely).

The sentence imposed must take into account the need for specific deterrence in order to prevent the defendant from reoffending in this or another manner. As noted above, the defendant's conduct was not a single failure of judgment or momentary ethical lapse. Rather, the defendant's conduct involved repeated, deliberate decisions – choices she made over an extended period of time and that required lucidity and deliberation. She and her co-conspirators structured vast portions of their business around a fraud. As such, the government respectfully submits that the defendant's risk of recidivism in some form or another is high and a sentence that provides specific deterrence is warranted.

Additionally, the court should strongly consider the need for general deterrence. As Judge Garaufis has observed, "[t]he need for general deterrence is particularly acute in the context of white-collar crime." United States v. Johnson, No. 16-CR-457 2018 WL 1997975, at *5 (E.D.N.Y. April 27, 2018) (Garaufis, J.); see also United States v. Martin, 455 F.3d 1227, 1240 (11th Cir. 2006) (citing S. Rep. No. 98-225, at 76 (1983), reprinted in 1984 U.S.C.C.A.N. 3182, 3259) ("Congress viewed [general] deterrence as 'particularly important in the area of white collar crime.'"); United States v. Mueffelman, 470 F.3d 33, 40 (1st Cir. 2006) (deterrence

5

of white-collar crime is "of central concern to Congress"). This is true, in part, because "[p]ersons who commit white-collar crimes like defendant's are capable of calculating the costs and benefits of their illegal activities relative to the severity of the punishments that may be imposed." Johnson, 2018 WL 1997975 at *5; see also Martin, 455 F.3d at 1240 ("Because economic and fraud-based crimes are more rational, cool, and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence." (internal quotation marks and citation omitted)); Harmelin v. Michigan, 501 U.S. 957, 988 (1991) ("Since deterrent effect depends not only upon the amount of the penalty but upon its certainty, crimes that are less grave but significantly more difficult to detect may warrant substantially higher penalties").

The need for general deterrence is particularly acute where the defendant abuses her professional privileges – in this case, her role as a licensed medical assistant who, by her own admission, Def. Mem. at 9-10, had the opportunity for substantial interaction with patients at Clinic-1. The deterrent effect of a significant sentence of imprisonment in this case would therefore be particularly valuable, as it would drive home to those with direct access to patients the risk of participating in this type of scheme, thereby risking the health of their patients as well as squandering much-needed Medicare and Medicaid funds.

V.   Restitution and Forfeiture

The government respectfully requests that the Court order the defendant to pay restitution in the amount of $11,323,292.36, consisting of claims paid by Medicare and Medicaid to the Scheme Pharmacies in connection with the conspiracy, in accordance with the Mandatory Victim Restitution Act and the plea agreement. See 18 U.S.C. § 3663A; Plea Agreement ¶ 1(e); PSR ¶¶ 45, 117. The restitution to be paid is as follows:

- The Medicare program in the amount of $3,040,623.92

- The Medicaid program in the amount of $8,282,668.44

Additionally, in the parties' plea agreement, the defendant agreed to the imposition of a forfeiture money judgment in the amount of $1,591,257.00, which reflects the defendant's proceeds from the conspiracy, as required by 18 U.S.C. § 982(a)(7). (Plea Agreement ¶ 6; PSR ¶¶ 116.) Accordingly, the government respectfully submits that the Court should issue the proposed forfeiture order that will be filed by the government in connection with sentencing, and requests that the Court incorporate that order into the judgment of conviction.

VI.     Conclusion

        For all the reasons articulated above, the government respectfully requests that the Court sentence the defendant to a term of imprisonment between 51 and 63 months and to pay restitution and criminal forfeiture in the amount and manner set forth above.

        Respectfully submitted,

        GLENN S. LEON  
        Chief  
        Criminal Division, Fraud Section  
        United States Department of Justice

By:    /s/ Miriam L. Glaser Dauermann  
       Miriam L. Glaser Dauermann  
       Trial Attorney  
       United States Department of Justice  
       Criminal Division, Fraud Section  
       (718) 254-7575

cc:    Vinoo Varghese, Esq. (counsel to defendant) (by email and ECF)  
       Senior U.S.P.O. Roberta Houlton (by email and ECF)